

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

MARY GARDNER, §
    PLAINTIFF, §
     §
v. § CIVIL ACTION NO. 4:10-CV-226-A
     §
MICHAEL J. ASTRUE, §
COMMISSIONER OF SOCIAL SECURITY, §
    DEFENDANT. §

## FINDINGS, CONCLUSIONS AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE
## AND
## NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of the United States Magistrate Judge are as follows:

## FINDINGS AND CONCLUSIONS

### I. STATEMENT OF THE CASE

Plaintiff Mary Gardner ("Gardner") filed this action pursuant to Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits under Title II[1] and supplemental security income ("SSI") benefits under Title XVI[2] of the Social Security

---

[1] With respect to applications for disability insurance benefits, the claimant must show she became disabled on or before the expiration of her insured status. *See Barraza v. Barnhart,* 61 F. App'x 917, 2003 WL 1098841, at *1 (5th Cir.2003) (citing *Ivy v. Sullivan,* 898 F.2d 1045, 1048 (5th Cir.1990)).

[2] With respect to applications for SSI, the first month for which SSI benefits can be paid is the month after the SSI application was filed regardless of how far back in time disability may extend. 42 U.S.C. § 1382(c)(7); 20 C.F.R. § 416.335.

1

Act ("SSA"). In September 2005, Gardner filed her third set of concurrent applications[3] for disability insurance and SSI benefits, alleging that she had been disabled since December 9, 2004. (Transcript ("Tr.") at 21, 129-33.) Her applications were denied initially and on reconsideration. (Tr. 21, 90-94, 97-103.) The Administrative Law Judge ("ALJ") held a hearing on August 15, 2007 and issued a decision on December 21, 2007 that Gardner was "disabled for the closed period between the alleged onset date and January 15, 2006." (Tr. 21; see Tr. 50-66, 1247-1285.)

On October 28, 2008, the Appeals Council affirmed the ALJ's decision that Gardner was disabled between December 9, 2004 and January 15, 2006; vacated the ALJ's decision as to the issue of disability after January 15, 2006; and remanded the case for further development.[4] (Tr. 21, 67-69.) The ALJ held a subsequent hearing on February 27, 2009 and issued a decision on March 27, 2009 that Gardner had experienced "work-related medical improvement and her disability ceased as of January 15, 2006." (Tr. 22, 31, 1286-1301.) The ALJ found that Gardner was not disabled as of January 15, 2006 because she was capable of performing her past relevant work as a mail clerk. (Tr. 33; see Tr. 18-34.) The Appeals Council denied Gardner's request for

---

[3] Gardner filed her first set of concurrent disability applications in October 1984. (Tr. 21, n.1.) These applications were denied initially and Gardner did not appeal this denial. (Id.) Gardner filed her second set of applications in December 2004. These applications were denied initially in July 2005. (Id.) The ALJ interpreted her most recent set of applications filed in September 2005 as an implied request that the ALJ "reopen and revise" the applications filed in December 2004. (Id.)

[4] Gardner also filed a new set of concurrent disability applications in August 2008. (Tr. 22 n.2, 69.) These applications were denied at the initial level. (Tr. 22 n.2.) However, because the issues of the remanded September 2005 applications and subsequent applications were identical, the Appeals Council ordered that the duplicitous August 2008 applications be consolidated into the September 2005 applications. (Tr. 22 n.2, 69.) Thus, the ALJ's March 27, 2009 decision encompassed all of Gardner's pending applications. (Tr. 22 n.2.)

2

review, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 10-12.)

## II. STANDARD OF REVIEW

Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq.*, and SSI benefits are governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, of the SSA. In addition, numerous regulatory provisions govern disability insurance and SSI benefits. *See* 20 C.F.R. Pt. 404 (disability insurance); 20 C.F.R. Pt. 416 (SSI). Although technically governed by different statutes and regulations, "[t]he law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

The SSA defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920 (2009). First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1572, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. 20 C.F.R. §§ 404.1520(d),

416.920(d); *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Listing"). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(f), 416.920(f). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(g), 416.920(g); *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir.1999). At steps one through four, the burden of proof rests upon the claimant to show he is disabled. *Crowley*, 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Hollis*, 837 F.2d at 1383.

## III. ISSUES

Gardner raises the following issues:

1. Whether the ALJ's finding that Gardner experienced "medical improvement" as of January 15, 2006 complied with the appropriate legal standards and is supported by substantial evidence; and

2. Whether substantial evidence supports the ALJ's assessment of Gardner's mental residual functional capacity ("RFC").

## IV. ADMINISTRATIVE RECORD

In his March 27, 2009 decision, the ALJ stated that even though Gardner had attempted to work after her alleged onset date of disability, such work did not rise to the level of substantial gainful activity. (Tr. 23, 32.) The ALJ further found that Gardner had the severe impairments of villous adenocarcinoma of the rectum, status-post resection, radiation and chemotherapy, with no recurrence or metastases; Chiari I malformation, with dizziness and headaches; histories of asthma and low back pain; obesity; and adjustment and panic disorders. (Tr. 23, 32.)

Next, the ALJ held that none of Gardner's impairments or combination of impairments met or equaled the severity of any impairment in the Listing. (Tr. 32.) As to Gardner's RFC, the ALJ found that during the closed period, she had the "exertional capacity for the sustained performance of a reduced range of sedentary work activities: she could not work at heights or near dangerous, open machinery, open flames or large bodies of water and she lacked the stamina to endure full eight-hour workdays on a sustained basis." (Tr. 32; *see* Tr. 25.) The ALJ, after reviewing the medical evidence in the record, concluded that "as of January 15, 2006, claimant experienced work-related medical improvement." (Tr. 22; *see* Tr. 33.) The ALJ then determined that Gardner regained the exertional capacity to perform a "modified range of

relatively less strenuous light work duties" with the following limitations: (1) no exposure to dust, fumes, and volatile chemicals; (2) no working near dangerous, moving machinery, open flames, large bodies of water, or at heights; (3) limited to "low end of detailed instructions and to jobs with incidental public contact." (Tr. 30-31; *see* Tr. 30-33.) As to the limitations on Gardner's mental RFC, the ALJ stated:

> No later than January 15, 2006, claimant's severe mental impairments have lead to a mild degree of restriction in her activities of daily life and a moderate degree of difficulty in her abilities to maintain (1) social functioning and (2) concentration, persistence or pace and she has experienced an extended episode of decompensation. Furthermore, there is no indication that a disorder has led to repeated, extended episodes of decompensation or resulted in such a marginal adjustment that even minimal increases in mental demands or environmental changes would cause decompensation and she has functioned outside of a highly supportive living arrangement. Furthermore, there is no indication that, secondary to the anxiety disorder, she is completely unable to function independently outside the area of her home.

(Tr. 33.) The ALJ further opined, based on his RFC assessment, that Gardner was able to perform her past relevant work as a mail clerk since January 15, 2006; thus, she was not disabled. (Tr. 31-33.)

## DISCUSSION

### A. Medical Improvement

Gardner claims that the ALJ's finding that she experienced medical improvement as of January 15, 2006 "does not comport with relevant legal standards and is not supported by substantial evidence." (Pl.'s Br. at 4.) Gardner argues that there is not any medical evidence actually dated January 15, 2006 in the record to support the ALJ's determination and, thus, such determination is arbitrary. (Pl.'s Br. at 5.) Gardner claims that the evidence in the record indicates the following: (1) Gardner suffered from syncopal episodes on the date her disability

6

began as well as in the same month that the ALJ found her disability had ended; (2) completion of Gardner's cancer treatment in February 2005 does not coincide with the date of medical improvement identified by the ALJ; (3) medical evidence indicates that Gardner "continued to suffer with dizziness, neck pain, and an Arnold Chairi I malformation after the date the ALJ found Plaintiff was no longer disabled;" (4) Gardner's anxiety worsened after the date the ALJ found Gardner was no longer disabled; and (5) the ALJ improperly relied on Gardner's daily activities in April 2006 as an indication that her energy level was improving to show that Gardner experienced medical improvement in January 2006. (Pl.'s Br. at 5-7) Gardner argues that "this case must be remanded . . . to allow the ALJ to reconsider his finding of medical improvement and to explain the evidence that supports improvement on the determined date, if any." (Pl.'s Br. at 8.)

"When the ALJ finds a claimant entitled to a closed period of disability, the ALJ must apply the medical improvement standard to articulate when the closed period ends." *Teague v. Astrue*, 342 F. App'x 962, 963 (5th Cir. 2009) (citing *Waters v. Barnhart*, 276 F.3d 716, 719 (5th Cir. 2002)). "Disability benefits may be terminated if there is substantial evidence that (1) there has been a medical improvement related to the ability to work, and (2) individual is now able to engage in substantial gainful activity. *Teague*, 342 F. App'x at 963-94 (citing 42 U.S.C. § 423(f)(1)). A "medical improvement" is any decrease in the medical severity of an impairment which was present at the time of the most recent favorable disability determination. *See* 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i). A finding that there has been a decrease in medical severity must be based on change in the symptoms, signs, or laboratory findings associated with the impairment. *Id.* "Medical improvement is related to a claimant's ability to work if there has

7

been a decrease in the severity of the impairment and an increase in the claimant's functional capacity to do basic work activities." *Teague*, 342 F. App'x at 964 (citing 20 C.F.R. § 404.1594(b)(3)). The burden to prove that the claimant is no longer disabled as of the cessation date is on the Commissioner. *Teague*, 342 F. App. at 964.

In this case, the ALJ relied, *inter alia*, on the following evidence in determining that Gardner had a work-related medical improvement as of January 15, 2006: (1) evidence that Gardner's cancer had not recurred or metastasized (Tr. 26); (2) although an abdominal MRI dated February 21, 2005 revealed a benign hepatic hemangioma in the liver and smaller, benign hepatic cysts, the radiologist opined there were no "significant pathologies or signs of adenocarcinoma" (Tr. 26; *see* Tr. 279); (3) x-rays of the chest and CT-scan of the abdomen and pelvis dated October 27, 2005 were normal (Tr. 26; *see* Tr. 585-86); (4) in April 2006, Domingo Tan, M.D., released Gardner from his care after he removed the porta-cath (Tr. 26; *see* Tr. 579-80); (4) esophagogastroduodenoscopy and colonoscopy dated February 20, 2006 were negative except for benign ulcers in the colon (Tr. 26; *see* Tr. 309-10, 313, 326-27); (5) whole body bone scan dated March 22, 2006 was negative for osseous metastases (Tr. 26; *see* Tr. 392-93); (6) treatment records from Robert Ruxer, M.D., from November 16, 2005 through July 2006 show that (a) Gardner's energy level was improving; (b) Gardner's diarrhea and abdominal cramps were abating; (c) she denied having side effects of fever, chills, and night sweats; and (d) she had quit taking Lexapro, the anti-depressant by July 19, 2006 and her physical condition was stable (Tr. 26; *see* Tr. 696-707); (7) Thomas Leavens, M.D., a neurologist, examined Gardner on February 8, 2006 for intermittent dizziness and concluded that the dizziness was associated with the Chiari I malformation and that she had possible cervical radiculopathy at C5-6 (Tr. 26; *see*

8

Tr. 522-24); (8) examination records dated from April 20, 2006 through October 18, 2006 from Thomas Ellis, M.D., a neurosurgeon, indicated that Gardner's Chiari I malformation was mild and the medication he prescribed was effective as it reduced her symptoms (Tr. 26; *see* Tr. 525-35); and (9) a consultative examination dated May 5, 2006 in which Wendell Jones, M.D., indicated that Gardner had "good blood pressure, regular pulse and respiration rates, and there were no abdominal, cardiovascular or respiratory abnormalities" and, *inter alia*, that she had normal gait and station, no difficulty getting on and off the examination table, and had full strength. (Tr. 27; *see* Tr. 344-47).

The ALJ also relied on the following evidence: (1) treatment records indicating that Gardner was treated at the emergency room on January 20, 2006, January 26, 2006, February 6, 2006, and June 9, 2007 for dizziness, but the test results indicated that everything was essentially normal (Tr. 27; *see* Tr. 328-35, 401-14, 646-61, 678-94); (2) results from a echocardiogram performed by Dale Anderson, M.D., a cardiologist, on August 20, 2007 that showed Gardner's overall cardiac functioning was well within normal limits (Tr. 27; *see* Tr. 637-45); (3) records indicating that Gardner was treated at the emergency room on October 15, 2007 for asthma after she had been out of her medication for some time and was dismissed with her medication (Tr. 27; *see* Tr. 1193-95); (4) a abdominal/pelvic CT-scan report dated January 8, 2008 in which the radiologist opined that the scan showed a hemangioma on the liver but he doubted it was evidence of a recurrence of the tumor and noted that Gardner had degenerative changes in the mid-level lumbar spine (Tr. 27; *see* Tr. 1198-99); (5) a stress test and echocardiogram dated November 24, 2008 that showed essentially normal results (Tr. 28; *see* Tr. 1205-19); (6) treatment records indicating that Gardner was treated at the emergency room for anxiety on

March 20, 2006 in the midst of a divorce and financial problems (Tr. 28; *see* Tr. 315-20); (7) records from 2006 in which Naffees Saifee, M.D., prescribed Gardner "common anti-depressant and anxiolytic medications for anxiety" (Tr. 28; *see* Tr. 609-12); (8) a neurological examination dated April 20, 2006, in which Thomas Ellis, M.D., observed that Gardner was alert and well-oriented, had appropriate insight and judgment, and performed "serial sevens" without difficulty (Tr. 28; *see* Tr. 527-29); (9) a consultative psychological examination on April 26, 2006 in which Jason Simpson, Psy.D., diagnosed Gardner with a panic disorder without agoraphobia and "opined that she had good prognosis with counseling" (Tr. 28; *see* Tr. 338-43); (10) a Physical Residual Functional Capacity Assessment ("PRFC") dated September 30, 2008 in which James Wright, M.D. ("Wright"), opined, in essence, that "claimant could perform only light base-level work activities"[5] (Tr. 29; *see* Tr. 1024-1031); (11) a Mental Residual Functional Capacity Assessment ("MRFC") dated May 22, 2006 in which Mark Boulos, M.D. ("Boulos"), opined that Gardner had the "ability to understand and follow detailed or complex instructions, to adequately relate to coworkers and supervisors, to concentrate for extended periods, and to adapt to changes in the routine work place" (Tr. 353; *see* Tr. 30, 351-54); (12) a Psychiatric Review Technique Form ("PRTF") also dated May 22, 2006 in which Boulos opined that Gardner suffered from a chronic adjustment disorder with anxiety and depressed mood and a panic disorder without agoraphobia, neither of which precisely satisfied the diagnostic criteria of any impairment in the listing, and that Gardner was mildly restricted in her activities of daily living, had moderate difficulties in maintaining social functioning, had mild difficulties in maintaining concentration,

---

[5] In the PRFC, Wright opined that Gardner could: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift/and or carry ten pounds; (3) sit, stand and/or walk about six hours in an eight-hour workday; and (4) had the unlimited ability to push and/or pull. (Tr. 1025.) Wright further opined that Gardner was frequently limited in her ability to climb ramps or stairs, balance, stoop, kneel, crouch, or crawl. (Tr. 1026.)

10

persistence, or pace and had one or two episodes of decompensation of extended duration (Tr. 30, 355-68); and (13) evidence that Gardner: (a) had not required psychiatric in-patient care, except for a recent overnight observation (*see* Tr. 1221-30), (b) had not received supervised or assisted living services, (c) had not been the subject of court-ordered mental health proceedings, (d) was raising her children as a single parent, and (e) did not take any psychotropic medication beyond the common anxiolytics she is prescribed by her non-psychiatrist primary care physician. (Tr. 30). (Tr. 26-30.)

Based upon this evidence, it is clear that substantial evidence supports the ALJ's decision that Gardner experienced medical improvement as of at least January 15, 2006. In his previous December 21, 2007 decision, the ALJ initially granted Gardner benefits for the period from December 9, 2004 through January 15, 2006 because, *inter alia*, the medical evidence indicated that she suffered from colon cancer and the effects of treatment for this impairment, as well as dizzy spells, lingering fatigue, weakness, abdominal distress and shortness of breath. (Tr. 56-59.) In contrast, beginning in February 2005, the medical evidence indicates that Gardner's condition had greatly improved, she had completed her treatment for colon cancer, and she was capable of engaging in substantial gainful activity. Although Gardner continues to suffer from some impairments, which the ALJ acknowledged, there is substantial evidence, as described above, supporting the ALJ's determination that Gardner's disability had ceased by, at the very least January 15, 2006, and that she was capable of performing a "modified range of relatively

less strenuous light work duties" with additional limitations.[6] Consequently, the ALJ did not err and remand is not required.

## B. Mental RFC

Gardner also argues that the ALJ's determination as to her mental RFC is not supported by substantial evidence. (Pl.'s Br. at 8.) Specifically Gardner claims that "the ALJ should have found Plaintiff's mental RFC is also affected by, at a minimum, a limited ability to work with supervisors and co-workers." (Pl.'s Br. at 9.) Gardner states, "Even the State agency physicians opine that Plaintiff has a moderate limitation in her ability to accept instructions and respond appropriately to criticism from supervisors." (*Id.*)

In evaluating mental disorders under the Listing, the ALJ first considers whether a claimant has a medically determinable mental impairment. *See* 20 C.F.R. Pt 4, Subpt. P, App. 1 § 12.00. To do so, the ALJ must specify the symptoms, signs, and laboratory findings that substantiate the presence of each impairment. 20 C.F.R. § 404.1520a(b)(1); *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001). The regulations require the ALJ to evaluate the degree of functional loss resulting from the claimant's mental impairments. 20 C.F.R. § 404.1520a. If an impairment is found, the ALJ must evaluate the claimant's limitations in four functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3).

---

[6] Although the Court agrees that it would have been preferable for the ALJ to choose a specific date that corresponded to a medical record or event indicating improvement, Gardner has failed to cite to any authority that the ALJ is required to cite to such a date. Instead, the cases cited to by Gardner indicate that the date chosen by the ALJ should not be arbitrary and should be supported by substantial evidence. In this case, it is clear that Gardner had experienced the medical improvement found by the ALJ "no later than" January 15, 2006 and this finding is supported by substantial evidence. Indeed, the medical evidence would support a finding of an earlier date of medical improvement had the ALJ so concluded.

After the ALJ rates the degree of functional limitation resulting from any mental impairment, the ALJ determines the severity of such impairment. 20 C.F.R. § 404.1520a(d). If the degree of functional loss falls below a specified level in each of the four areas, the ALJ must find the impairment is not severe at Step Two of the sequential evaluation process, which generally concludes the analysis and terminates the proceedings. 20 C.F.R. § 404.1520a(d)(1). If the ALJ finds that the mental impairment is severe at Step Two, then the ALJ must determine if it meets or equals a listed mental disorder under Sections 12.00-12.09 of the Listing. 20 C.F.R. §§ 404.1520a(d)(2). To determine if it meets or is equivalent in severity to a listed mental disorder, the ALJ must compare the medical findings about the claimant's impairment and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). If the impairment is severe but does not meet or equal a listed mental impairment, then the ALJ must conduct an RFC assessment. 20 C.F.R. § 404.1520a(d)(3); *see Boyd*, 239 F.3d at 705. The ALJ's written decision must incorporate pertinent findings and conclusions based on the technique and must include a specific finding of the degree of limitation in each of the functional areas described. 20 C.F.R. § 404.1520a(e)(2).

RFC is what an individual can still do despite her limitations.[7] Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. *Id. See Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule.

---

[7]The Commissioner's analysis at Steps Four and Five of the disability evaluation process is based on the assessment of the claimant's RFC. *Perez v. Barnhart*, 415 F.3d 457, 461-62 (5th Cir. 2005). The Commissioner assesses the RFC before proceeding from Step Three to Step Four. *Id.*

13

*Id.* RFC is not the least an individual can do, but the most. SSR 96-8p at *2. The RFC assessment is a function-by-function assessment, with both exertional and nonexertional factors to be considered and is based upon all of the relevant evidence in the case record, including medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, and work evaluations. *Id.* at *3-5. The ALJ will discuss the claimant's ability to perform sustained work activity on a regular and continuing basis, and will resolve any inconsistencies in the evidence. *Id.* at *7. In making an RFC assessment, the ALJ must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, and must consider limitations and restrictions imposed by all of an individual's impairments, even impairments that are not severe. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996); SSR 96-8p at *5. The ALJ is permitted to draw reasonable inferences from the evidence in making his decision, but the social security rulings also caution that presumptions, speculation, and supposition do not constitute evidence. *See, e.g.*, SSR 86-8, 1986 WL 68636, at *8 (S.S.A. 1986), *superseded by* SSR 91-7c, 1991 WL 231791, at *1 (S.S.A. Aug. 1, 1991) (only to the extent the SSR discusses the former procedures used to determine disability in children).

At Step Two of the sequential evaluation process, the ALJ found that Gardner's mental impairment of adjustment and panic disorders were severe but they did not meet or equal an impairment in the Listing. (Tr. 32.) The ALJ further held that, no later than January 15, 2006, "claimant's severe mental impairments have lead to a mild degree of restriction in her activities of daily life and a moderate degree of difficulty in her abilities to maintain (1) social functioning

and (2) concentration, persistence or pace and she has experienced an extended episode of decompensation." (Tr. 33.) As to Gardner's mental RFC since January 15, 2006, the ALJ found that Gardner was "limited to tasks at the low end of detailed instructions and to jobs with only incidental public contact." (Tr. 33.)

In making his mental RFC determination, the ALJ reviewed the evidence in the record, specifically referring to, *inter alia*, the following: (1) the May 22, 2006 MRFC in which Boulos ultimately opined that Gardner had "the ability to understand and follow detailed or complex instructions, to adequately relate to coworkers and supervisors, to concentrate for extended periods, and to adapt to changes in the routine work place" (Tr. 30, 353; *see* Tr. 351-68); (2) the May 22, 2006 PRTF in which Boulos also opined, *inter alia*, that Gardner was mildly restricted in her activities of daily living, had moderate difficulties in maintaining social functioning, had mild difficulties in maintaining concentration, persistence, or pace and had one or two episodes of decompensation of extended duration (Tr. 30, 355-68); and (3) evidence that Gardner: (a) had not required psychiatric in-patient care, except for a recent overnight observation, (b) had not received supervised or assisted living services, (c) had not been the subject of court-ordered mental health proceedings, (d) was raising her children as a single parent, and (e) did not take any psychotropic medication beyond the common anxiolytics she is prescribed by her non-psychiatrist primary care physician" (Tr. 30). Based upon this and other evidence, the ALJ discounted the contradictory evidence in the record that indicated that Gardner might be more functionally limited in her ability to work with supervisors and co-employees. (Tr. 24.)

The ALJ is not required to incorporate limitations in the RFC that he did not find to be supported in the record. *See Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988). "While the

15

regulations require the ALJ to evaluate[] the limitations imposed by Plaintiff's mental impairments in certain areas and direct the ALJ to proceed to the RFC determination if Plaintiff's impairments are found severe, the regulations do not specifically require the ALJ to find that the limitations found in evaluating the mental impairment must be word-for-word incorporated into either the RFC determination or the hypothetical questions posed to the VE." *Patterson v. Astrue*, No. 1:08-CV-109-C, 2009 WL 3110205, at *5 (N.D. Tex. Sept. 29, 2009).

In this case, the record indicates that the ALJ incorporated Gardner's functional limitations from his mental impairment into the RFC based upon the ALJ's evaluation of the evidence. The ALJ followed the technique set forth above for the evaluation of Gardner's mental impairments. *See generally* 20 C.F.R. §§ 404.1520a, 416.920a. In addition, the ALJ properly discussed the evidence in the record in making his RFC determination, explained the reasoning for his RFC determination and for giving less weight to certain evidence, and exercised his responsibility as factfinder in weighing the evidence and in choosing to incorporate limitations into his RFC assessment that were most supported by the record. *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991). Because there is substantial evidence in the record that supports the ALJ's mental RFC assessment, the Court concludes that the ALJ did not err by failing to include any other alleged functional limitations imposed by Gardner's mental impairment into such RFC determination. Consequently, the Commissioner's decision should be affirmed.[8]

---

[8] Gardner's argument that the ALJ erred in not finding that she was limited in her ability to work with supervisors and co-workers appears to be based, at least in part, on Boulos' May 22, 2006 MRFC. In Section I of the MRFC, which is titled "Summary Conclusions," Boulos found that Gardner was, *inter alia*, moderately limited in her ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. (Tr. 352.) While the Court agrees that the ALJ did not specifically mention this

# RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

## NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within fourteen (14) days after the party has been served with a copy of this document. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error

---

limitation noted in Section I of the above-referenced MRFC, there is "nothing in the commissioner's regulations or rulings that requires an ALJ to make findings concerning each of the limitations listed [in Section I] on the 'Summary Conclusions' portion of the [MRFC] forms utilized by the SAMCs in assessing a claimant's mental residual functional capacity." *Huber v. Astrue*, No. 4:07-CV-477-A, 2008 WL 4694753, at *7 (N.D. Tex. Oct. 22, 2008).

Furthermore, according to the Commissioner's Programs Operations Manual System ("POMS"), Section I of the MRFC, which contains the limitation that Gardner's claims should not have been left out of the RFC, is "merely a worksheet to aid [the medical consultant] in deciding the presence and degree of functional limitations and the adequacy of documentation and does not constitute the RFC assessment." POMS § DI 24510.060B.2. Section III of the MRFC, which is titled "Functional Capacity Assessment," "is for recording the mental RFC determination." POMS § DI 24510.060B.4. "It is in this section that the actual mental RFC assessment is recorded, explaining the conclusions indicated in section I, in terms of the extent to which these mental capacities or functions could or could not be performed in work settings." *Id.* Thus, based upon the MRFC form itself, it was not error for the ALJ to fail to include or discuss the items from Section I of the form in assessing Gardner's RFC as it did not contain the actual opinion of Boulos as to Gardner's RFC. Instead, it is Section III that contains the actual mental RFC assessment.

In Section III of the MRFC, Boulos opined that Gardner "has [the] ability to understand and follow detailed or complex instructions, to adequately relate to coworkers and supervisors, to concentrate for extended periods, and to adapt to changes in the routine work place." (Tr. 353). Thus, according to Section III of the MRFC, Gardner was able to adequately relate to coworkers and supervisors.

17

or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

### ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until May 3, 2011 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED April 19, 2011.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE

JLC/knv